**William L. HOEPER, Plaintiff–Appellee and Cross–Appellant,**

v.

**AIR WISCONSIN AIRLINES CORPORA-TION, a Delaware corporation, Defendant–Appellant and Cross–Appellee.**

No. 08CA1358.

Colorado Court of Appeals, Div. IV.

Nov. 12, 2009.

Overturf McGath Hull & Doherty, P.C., Scott A. McGath, Jason P. Rietz, Nikolai N. Frant, Denver, Colorado, for Plaintiff–Appellee and Cross–Appellant.

Jaudon & Avery LLP, Alan D. Avery, David H. Yun, Jared R. Ellis, Denver, Colorado, for Defendant–Appellant and Cross–Appellee.

David M. Gaouette, United States Attorney, Paul Farley, Assistant United States Attorney, Denver, Colorado, for Amicus Curiae United States.

Jaudon & Avery, LLP, Alan D. Avery, David H. Yun, Denver, Colorado; Crowell & Moring, LLP, Lorraine B. Halloway, Washington, D.C., for Amicus Curiae Regional Airline Association.

Opinion by Judge WEBB.

This case juxtaposes important air transportation safety procedures established by federal statute against remedies for defamation under state common law. Defendant, Air Wisconsin Airlines Corporation, appeals the judgment entered on a jury verdict in favor of plaintiff, William L. Hoeper, on his defamation claim, awarding $849,625 in compensatory damages and $391,875 in punitive damages.

Air Wisconsin primarily asserts that section 44941 of the Federal Aviation and Transportation Security Act (ATSA) provides immunity from liability for its employee's allegedly defamatory statements to the Transportation Security Administration (TSA) connoting that Hoeper was a threat to a departing aircraft because he was mentally unstable and possibly armed. Hoeper cross-appeals the trial court's refusal to award prejudgment interest. These issues are before us on a C.R.C.P. 54(b) order entered pending retrial of Hoeper's outrageous conduct claim, on which the jury failed to reach a verdict.

We conclude that the trial court properly submitted the ATSA immunity issue to the jury; the record supports the jury's rejection of immunity; the employee's statements to TSA were not protected opinions because they conveyed provably false negative connotations; reviewed de novo, the record includes clear and convincing evidence that the employee acted with actual malice; and Hoeper did not preserve his claims for prejudgment interest under Virginia law. Therefore, we affirm and remand for further proceedings on his outrageous conduct claim.

### I. Facts

Air Wisconsin is a commercial airline that provides regional service as United Express. When this action arose, Hoeper had been an Air Wisconsin captain since 1998 and the individual defendants, Mark Schuerman, Patrick Doyle, and Scott Orozco, who are not

parties to this appeal, were Air Wisconsin employees.

In September, October, and November 2004, Hoeper failed three proficiency checks during his flight simulator training to fly a larger aircraft. In debriefings following two of those failures, verbal confrontations occurred between Hoeper and Doyle, Air Wisconsin's fleet manager, and between Hoeper and Todd Hanneman, an Air Wisconsin instructor pilot.

Although Air Wisconsin could have terminated Hoeper after the third proficiency check failure, he was given a fourth opportunity under a last chance agreement. In exchange, Hoeper waived certain rights under his collective bargaining agreement. Before Hoeper could attempt the final proficiency check, however, he needed additional training and the recommendation of an Air Wisconsin instructor pilot.

On December 8, 2004, Hoeper flew from Denver to Virginia for flight simulator training with Schuerman, another instructor pilot, in a simulator owned by another company. During that training, a dispute arose. Hoeper raised his voice, used profanity, and terminated the session. For an experienced pilot, such behavior was unusual. He also told Schuerman that he intended to contact the Air Line Pilots Association (ALPA) for legal advice.

About 11:00 a.m., CST, Schuerman called Doyle, who was at Air Wisconsin's headquarters in Wisconsin, to report that Hoeper "had blown up and was very angry at me," and that he was "uncomfortable" remaining at the simulator with Hoeper. Schuerman did not say that Hoeper was threatening or unstable, nor did Doyle ask if Schuerman felt threatened by Hoeper. Doyle testified that based on this information, he was very fearful of what Hoeper might do.

Doyle arranged for Air Wisconsin to book Hoeper on a United Air Lines (UAL) flight to Denver leaving from Dulles International Airport (Dulles) at 1:30 p.m. Then Doyle called Daniel Scharf, an Air Wisconsin em-

ployee who had been acting as Hoeper's first officer during the training, and asked him to drive Hoeper to Dulles. Doyle did not request Scharf to provide any information about what had occurred at the simulator, nor did Doyle tell Scharf that Hoeper might be dangerous. Doyle had no further contact with either Schuerman or Scharf that day, and he never spoke to Hoeper.

When Hoeper could not make the 1:30 flight, Air Wisconsin booked him on a later UAL flight. Doyle did not take any steps to induce UAL, for which Air Wisconsin performs passenger and baggage transfer services at Dulles and elsewhere in the country, to limit Hoeper's access to the aircraft. UAL could have done so independently of TSA had it been informed of a problem with Hoeper.

Before noon, Doyle approached Orozco, Air Wisconsin's Chief Pilot, who officed next to Doyle about Hoeper. Orozco told Doyle that he was leaving for a meeting. By approximately 1:30 p.m., Orozco had returned and taken a very brief telephone call from Hoeper and an ALPA attorney. Orozco confirmed that the training was over and Hoeper was to fly back to Denver, but made no other inquiries. Orozco never spoke to Schuerman or Scharf.

Shortly thereafter, Doyle and Orozco began discussing Hoeper. They were joined by Kevin LaWare, an Air Wisconsin vice president to whom Doyle reported, and later by Robert Frisch, the Assistant Chief Pilot, who reported to Orozco. The four talked about: Doyle's conversation with Schuerman; Hoeper's prior displays of anger in training sessions; Hoeper's expectation of being terminated based on the failed training and the last chance agreement; as a Federal Flight Deck Officer (FFDO), Hoeper could carry a weapon aboard a commercial aircraft[1]; at Denver International Airport, he could have boarded without checking his weapon; whether any means existed to determine the whereabouts of his weapon; one other Air

---

1. The FFDO program deputizes volunteer pilots of air carriers as federal law enforcement officers. Eligible flight crewmembers are authorized by the TSA to use firearms to defend against an act of criminal violence or air piracy attempting to gain control of an aircraft. 49 U.S.C. § 44921.

Wisconsin pilot had brought an FFDO weapon to simulator training in violation of FFDO procedures; and two incidents that had occurred before the FFDO program involving disgruntled employees of other airlines who had boarded aircraft with firearms and had caused incidents leading to deaths and injuries.

The meeting lasted 15–20 minutes and included unrelated operational issues. LaWare was not told that Orozco had just spoken to Hoeper. Orozco, Doyle, and LaWare testified that the group had concluded they could not determine whether Hoeper had his FFDO firearm with him. Orozco and LaWare also testified that they had no specific reason to believe Hoeper had brought his weapon with him in violation of FFDO procedures, although they could not preclude that possibility. Frisch testified that he did not remember discussing any specific reason why Hoeper would have brought his weapon with him.

According to Orozco, the whereabouts of Hoeper's weapon "was more of a question than a concern," and he would not have wanted Doyle to tell TSA that Hoeper "may be armed." LaWare did not anticipate that Doyle would use those words to TSA. None of the four men knew of Hoeper having brought his weapon to the earlier trainings or otherwise having ever violated FFDO weapons procedures.

At the end of the meeting and without calling Schuerman for more information, LaWare decided that TSA should be contacted. He testified that he acted pursuant to that agency's Aircraft Operator Standard Security Program [2], and because TSA oversees the FFDO program.[3] Orozco recalled LaWare saying "we should at least ask TSA if they have any concerns," but LaWare did not instruct Doyle what, specifically, to say. Nor did Doyle indicate what he planned to say.

In a pretrial deposition, Schuerman testified that Hoeper did not pose a threat to anyone. At trial, LaWare agreed that this testimony was not as Doyle had articulated the situation. Orozco testified that Schuerman's description of Hoeper "wasn't the information conveyed to me [by Doyle]." Frisch recalled no reason having been presented why Hoeper would be a threat to the UAL flight, nor did he draw this conclusion.

Doyle called TSA shortly after 2:00 p.m., CST. The jury found that Doyle made the following statements during that call:

- [Hoeper] was an FFDO who may be armed. He was traveling from IAD–DEN later that day and we were concerned about his mental stability and the whereabouts of his firearm.

- Unstable pilot in FFDO program was terminated today.

At trial, Doyle acknowledged that he lacked the ability to assess Hoeper's mental stability and denied having made such a statement to TSA "because I did not want to cause Mr. Hoeper undue harm." LaWare and Orozco testified that they did not consider Hoeper mentally unstable, although Orozco felt that Hoeper "was acting irrational" when he stopped the simulator training. Frisch did not have any information at the time that Hoeper's mental stability was in question. LaWare could not recall Doyle saying that he had concerns about Hoeper's mental stability, and testified that he would not have told TSA Hoeper was mentally unstable. Orozco testified that he did not intend for Doyle to tell TSA anything about Hoeper's mental stability.

As a result of Doyle's call, the aircraft carrying Hoeper was returned to the gate and armed officers removed him. He was detained and questioned by TSA, which eventually released him, and he returned to Denver. The next day, Orozco told him that his Air Wisconsin employment was terminated.

---

**2.** This document is not in the record because it is considered classified and various witnesses refused to testify concerning its provisions.

**3.** The parties presented conflicting expert testimony by former TSA employees on Air Wisconsin's duties under ATSA. Because we do not rely on this testimony, we decline to address the assertion of amicus United States that by testifying those former employees violated TSA regulations adopted pursuant to *United States ex rel. Touhy v. Ragen,* 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951).

On the evening of December 8, Doyle spoke with officials from various federal agencies about his call to TSA. The next day, he created notes of this call and of a confrontation with Hoeper that had allegedly occurred after simulator training on October 14. The notes of the October incident included the statement, "I ended the debriefing session for fear of my own physical harm." Later, Doyle changed those notes, which he described as a "working document," to add the phrase, "... harm, and the safety of others at the simulator."

Doyle admitted that he had not previously documented this incident, but testified that he had reported it to Orozco. Orozco recalled Doyle having said that he was not comfortable being in the same room with Hoeper after the training, although Orozco had never heard from Doyle or anyone else that Hoeper had left Doyle fearful for his safety or that of others. Orozco explained that any such fear should have been contemporaneously documented in Hoeper's records. Orozco added that he never considered Hoeper a threat to the safety of Air Wisconsin personnel before December 8.

Doyle also admitted that he took no action concerning the alleged confrontation with Hoeper, such as referring him to the company's employee assistance program, or to protect staff at the simulator. He arranged for Hoeper to have additional simulator training in November with Air Wisconsin personnel. Hoeper acknowledged that, in a meeting with Doyle after the mid-October training, he had used profanity and Doyle told him to sit down, but denied any more to the alleged "confrontation" than this exchange.

In a 2006 arbitration between Hoeper and Air Wisconsin, Doyle testified that following the alleged October confrontation with Hoeper, he had driven him to the airport. Hoeper testified that after the training he, Doyle, and another Air Wisconsin employee involved in that training had dinner and drinks together. Doyle acknowledged that upon hearing Hoeper's testimony, he realized his own testimony about what happened after the training session ended had been inaccurate but did not correct his testimony.

## II. Immunity under Section 44941 of the ATSA

### A. Judge/Jury Function

■ Air Wisconsin first contends the trial court erred in submitting the question of its ATSA immunity for reporting a suspicious transaction to the jury rather than treating immunity as a threshold issue for the court. Because of the fact-dependent nature of the statutory criteria—"suspicious transaction" and "reckless disregard"—we conclude that the trial court correctly sent this question to the jury.

The parties agree that Virginia substantive law and Colorado procedural law apply. We begin by examining the ATSA. Statutory interpretation is an issue of law that we review de novo. *Stamp v. Vail Corp.*, 172 P.3d 437, 442 (Colo.2007). When the statutory language is unambiguous, we construe the plain meaning of the statute without resorting to other rules of statutory construction. *Id.* at 443.

The ATSA, enacted in response to the terrorist attacks of September 11, 2001, federalized aviation security and created the TSA.[4] As a matter of policy, we agree with amicus United States that "[a]ir transportation security depends in significant part on the ability of the [TSA] to obtain intelligence; TSA must be made aware of any and all potential threats in order to expeditiously take necessary protective actions. Air carriers are perhaps the most obvious source of useful threat information for TSA." [5]

ATSA provides qualified immunity:

(a) In general. Any air carrier or foreign air carrier or any employee of an air carrier or foreign air carrier who makes a voluntary disclosure of any suspicious

---

**4.** *See generally* Kent C. Kruse, *Putting the Transportation Security Administration in Historical Context,* 68 J. Air L. & Comm. 233 (Spring 2003).

**5.** *See also* House Conference Report on the Aviation and Transportation Security Act, H.R. Conf. Rep. 107–296 (2001), U.S.Code Cong. & Admin.News 2002, p. 589 ("The conferees recognize that the safety and security of the civil air transportation system is critical to the security of the United States and its national defense....").

transaction relevant to a possible violation of law or regulation, relating to ... a threat to aircraft or passenger safety ... to any employee or agent of the Department of Transportation, the Department of Justice, any Federal, State, or local law enforcement officer, or any airport or airline security officer shall not be civilly liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, for such disclosure.

(b) Application. Subsection (a) shall not apply to

(1) any disclosure made with actual knowledge that the disclosure was false, inaccurate, or misleading; or

(2) any disclosure made with reckless disregard as to the truth or falsity of that disclosure.

49 U.S.C. § 44941. This language requires fact-finding at two levels: first, whether a suspicious transaction occurred; and, second, whether the air carrier exhibited reckless disregard in making the disclosure.

The parties have not cited any case, nor have we found one, reaching the merits of immunity under section 44941.[6] The legislative history does not address whether immunity is for the judge or the jury. *See* H.R. Conf. Rep. No. 107–296 (2001), U.S.Code Cong. & Admin.News 2002, p. 589.

■ A court usually applies its own procedural rules even where, as here, the substantive law of another state (Virginia) governs the merits. Restatement (Second) of Conflict of Laws § 122; *see Apache Village, Inc. v. Coleman Co.,* 776 P.2d 1154, 1155 (Colo. App.1989). The right to a civil jury trial in Colorado is procedural. C.R.C.P. 38; *Setc-*

*hell v. Dellacroce,* 169 Colo. 212, 215, 454 P.2d 804, 806 (1969). Hence, the allocation of decision-making between judge and jury is a procedural question to be governed by Colorado law, not the substantive law of Virginia.[7]

Colorado has approximately 30 statutes that confer qualified immunity in a variety of circumstances. But we have not found any reported case in which a court has taken from the jury an immunity question involving a disputed issue of material fact.

Because section 44941 provides qualified immunity that is forfeited by reporting with reckless disregard for the truth of the facts reported, we are guided by *Martin v. Weld County,* 43 Colo.App. 49, 598 P.2d 532 (1979), decided under the Colorado abuse reporting statute, section 19–3–309, C.R.S.2009. Persons who report child abuse are protected as long as the report is made in "good faith." Such decisions "necessarily involve [a defendant's] state of mind" and must be resolved from all evidence, cross-examination, and "determination of credibility made by the trier of facts." *Martin,* 43 Colo.App. at 53, 598 P.2d at 535.

We are not persuaded otherwise by Air Wisconsin's citation to cases decided under the Colorado Governmental Immunity Act (CGIA), §§ 24–10–101 to –120, C.R.S.2009, and the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. §§ 11101–11152.

The CGIA prohibits actions against government entities and their employees, subject to certain exceptions and statutory notice. Thus, these threshold questions are jurisdictional for the trial court's resolution under C.R.C.P. 12(b)(1), even if the facts are disputed. *City of Lakewood v. Brace,* 919 P.2d 231, 244 (Colo.1996); *see also Trinity*

6. We discern no consensus among the federal courts whether qualified immunity in other contexts may be submitted to the jury or must be resolved by the judge. Even though qualified immunity is generally to be determined as early in litigation as possible, some circuits allow disputed issues of material fact to go to the jury. *Curley v. Klem,* 499 F.3d 199, 209 (3d Cir.2007) (identifying the circuit split; specifically that the First, Fourth, Seventh, and Eleventh Circuits reserve the question of immunity to the court (with the Second and Eighth Circuits evolving in this direction as well), while the Fifth, Sixth, Ninth,

and Tenth Circuits permit immunity to go to the jury); *see also Keylon v. City of Albuquerque,* 535 F.3d 1210, 1217 (10th Cir.2008).

7. Under general *Erie* principles, questions of judge/jury allocation not addressed in a specific federal rule of procedure are considered matters of procedure. *See* 19 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4511, at 322 (listing federal cases where the court has disregarded state law relating to size of juries, unanimity of jury verdicts, and jury instructions).

*Broadcasting of Denver, Inc. v. City of Westminster,* 848 P.2d 916, 924–25 (Colo.1993) (trial court should have treated matter as a 12(b)(1) motion rather than a 12(b)(6) because, under 12(b)(1) "the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case") (internal quotations omitted); *Fogg v. Macaluso,* 892 P.2d 271, 276 (Colo.1995) (reaffirming that immunity under CGIA is properly addressed under C.R.C.P. 12(b)(1) and that trial court is the fact finder in such cases).

However, where an action proceeds based on an exception, the CGIA provides government employees with qualified immunity from tort suits if their conduct was not "willful and wanton." *City of Lakewood v. Brace,* 919 P.2d at 246. That determination is for the jury. *Id.*

Thus, on the one hand, the ATSA is different from the CGIA because the ATSA does not prohibit actions, subject to exceptions that are jurisdictional. On the other hand, it is like the CGIA qualified immunity provision for government employees, under which the jury decides immunity where, as here, material factual disputes exist.

The HCQIA is distinguishable because it presumes immunity. In contrast, under the ATSA, a defendant air carrier or its employees must prove that they are within the protection of the statute.

The HCQIA has been extensively analyzed by several federal courts, which have relied on its legislative history in concluding that the immunity question is for the court. *See, e.g., Brown v. Presbyterian Healthcare Services,* 101 F.3d 1324, 1333 (10th Cir.1996). No similar analysis exists for the ATSA, perhaps because its legislative history is silent on judge/jury allocation.

█ Moreover, any error in submitting the immunity question to the jury was rendered harmless because the jury necessarily found actual malice in awarding presumed and punitive damages, which we conclude on de novo review in section IV(C) below is supported by clear and convincing evidence. As amicus United States observes, "[w]hile the jury made this finding [of actual malice] in the context of awarding punitive damages, such a finding—if supported by the evidence—precludes application of Aviation Security Act immunity because the statute does not apply to statements made 'with actual knowledge that the disclosure was false, inaccurate or misleading' or 'with reckless disregard as to the truth or falsity of that disclosure.'" *Cf. Government Micro Resources, Inc. v. Jackson,* 271 Va. 29, 624 S.E.2d 63, 70–71 (2006) (failure to instruct jury on qualified privilege was harmless error because actual malice, which jury necessarily found in awarding punitive damages, defeats privilege).

Accordingly, we conclude that because issues of material fact were in dispute, the question of Air Wisconsin's immunity was properly submitted to the jury.

### B. The Jury's Rejection of ATSA Immunity

Consistent with section 44941, the jury was instructed:

> If you find that Defendant AWAC made any of the following statements ... you must then determine whether Defendant's affirmative defense pursuant to the Aviation and Transportation Security Act is applicable. Defendant is not legally responsible to Plaintiff for defamation based upon these statements if it proves that Defendant: (1) voluntarily; (2) disclosed information about a suspicious transaction; (3) that was reasonably related to a threat to aircraft and passenger safety; (4) to an employee or agent of the Department of Transportation or Federal law enforcement.

> However, this defense will not prevent Defendant from being legally responsible to Plaintiff on his defamation claim based upon these statements if Plaintiff proves that (1) Defendant made the disclosure with actual knowledge that the disclosure was false, inaccurate, or misleading; or (2) Defendant made the disclosure with reckless disregard as to its truth or falsity.

Air Wisconsin does not challenge the form of the instruction, but asserts that the evidence entitled it to immunity. We disagree.

■ Our review of a jury's verdict is highly deferential. *Palmer v. Diaz*, 214 P.3d 546, 550 (Colo.App.2009) ("In determining whether a jury verdict is supported by the evidence, we review the record in the light most favorable to the prevailing party, and every inference fairly deducible from the evidence is drawn in favor of the judgment. Appellate courts are bound by a jury's findings and may not disturb a jury verdict unless it is clearly erroneous.").

The reckless disregard language of section 44941(2) tracks the definition of "actual malice" required for defamation actions to pass constitutional muster. *See, e.g., Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 510–11, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Because in section IV(C) below we conclude that the evidence shows Doyle acted with reckless disregard, we necessarily also conclude that the record supports the jury's finding that Air Wisconsin failed to meet the immunity provision of the ATSA. And because reckless disregard defeats Air Wisconsin's immunity, we need not address whether Hoeper's behavior was a "suspicious transaction" under the ATSA.

### III. Publication of the Second Statement

■ Air Wisconsin next contends Hoeper presented insufficient evidence that Doyle ever made the second statement, "Unstable pilot in FFDO program was terminated today," which the jury found that he had made. We disagree.

■ The jury resolves disputed issues of fact, including the credibility of witnesses. *See, e.g., Clinger v. Hartshorn*, 89 P.3d 462, 466 (Colo.App.2003).

We conclude that the following substantial and competent evidence supports the verdict:

- Doyle's notes of the call to TSA, made the day afterwards, refer to "an FFDO who may be armed" and concern about "his mental stability at the time."
- TSA's contemporaneous documentation of the call carries the header, "Unstable pilot in FFDO program was terminated today." The text of this message includes, "[redacted] called to advise of an Air Wisconsin Pilot who was terminated today . . . . [redacted] has been displaying unstable tendencies." The next message in the string continues, "[redacted], who advised TCC that [redacted] bizarre behavior led to his termination on December 8, also reported . . . ."
- Although Doyle denied having described Hoeper as "unstable," he admitted to having spoken with TSA for about ten minutes.

### IV. Defamation

Air Wisconsin next challenges the defamation verdict on two grounds: first, because Doyle's statements to the TSA were opinion and substantially true, they should not have been submitted to the jury; and, second, an independent review of the record does not support the jury's finding of actual malice. We conclude that the statements were not protected as opinion because they conveyed provably false factual connotations, and our independent review of the record identifies clear and convincing evidence of actual malice.

### A. Law

The jury was instructed that to award either presumed or punitive damages, it had to find that Air Wisconsin acted with actual malice: knowledge of falsity or reckless disregard for truth. Neither party challenges these instructions.

The parties concede that we must review the punitive damages award de novo, applying the actual malice standard. However, Hoeper contends de novo review does not extend to compensatory damages. We are not persuaded.

■ Defamation law has been constitutionalized to protect the First Amendment guarantees of freedom of speech and the press. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Here, those constitutional protections apply because Hoeper was awarded both punitive and presumed damages[8] and, as discussed

---

8. The jury was instructed: "If you return a verdict for the plaintiff, and you further find that

below, Doyle's communications about a threat to airline safety were a matter of public concern.

■■■ "[W]hether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection" must be determined independently by the reviewing court. *Bose Corp.*, 466 U.S. at 511, 104 S.Ct. 1949. This standard of review requires an appellate court to determine whether "the evidence in the record ... is sufficient to support a finding of actual malice." *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 687, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). To prove actual malice, a plaintiff must show that the defendant published a false statement knowing it to be false or in reckless disregard of its falsity. *New York Times*, 376 U.S. at 280, 84 S.Ct. 710.

### 1. Presumed and Punitive Damages

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court held that defamation plaintiffs awarded presumed or punitive damages must demonstrate that the publisher acted with actual malice. *Id.* at 349–50, 94 S.Ct. 2997; *see also Fleming v. Moore*, 221 Va. 884, 275 S.E.2d 632, 638 (1981) (applying *New York Times* actual malice standard of proof to award of punitive damages). In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759–60, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), the Supreme Court clarified that the First Amendment does not require actual malice or de novo review in purely private defamation cases, even those involving awards of presumed and punitive damages. But the Court went on to explain that it would strike a different balance between the First Amendment and the state interest in providing compensation for reputational injury where the speech dealt with matters of public concern: "speech on

public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Id.* at 759, 105 S.Ct. 2939 (internal references omitted).

Because in the next subsection we conclude that Doyle's statement raised a matter of public concern, we decline to address Hoeper's argument that Virginia law does not require de novo review of presumed compensatory damages in a purely private action. *Compare Gazette, Inc. v. Harris*, 229 Va. 1, 325 S.E.2d 713, 727 (1985) ("[A]n appellate court in Virginia must conduct such independent examination of the whole record on the issue of punitive damages or where *New York Times* malice must be established, but not on the question of compensatory damages when *New York Times* malice need not be proven."), *with Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 334 S.E.2d 846, 852 (1985) ("[T]he question whether to apply the *Gertz* rule prohibiting presumed damages in the absence of *New York Times* malice depends not on the status of the defendant, but rather upon the nature of the defamatory words.... [W]e will not, as a matter of state law, apply to speech actionable per se, involving no matters of public concern, the *Gertz* rule inhibiting presumed compensatory damages.").

### 2. Matter of Public Concern

■■■ Awards of actual damages in defamation cases based on statements involving matters of public concern require actual malice and de novo review. *Gertz*, 418 U.S. at 349, 94 S.Ct. 2997; *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 15–16, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

■■■ "Whether ... speech addresses a matter of public concern must be determined by [the expression's] content, form, and context [of a given statement], as revealed by

---

plaintiff proved by clear and convincing evidence ... that defendant made the alleged defamatory statement knowing that it was false or with reckless disregard for its truth or falsity, the plaintiff is entitled to recover compensatory damages without any proof of actual or pecuniary injury or the quantum of injury. The statement alleged in this case is understood to mean that the effect

of the words is prejudicial to the plaintiff in his work. As a result, if you find that defendant made the alleged defamatory statement knowing that it was false or with reckless disregard for its truth or falsity, injury to the plaintiff's personal and business reputation, humiliation, and embarrassment is presumed."

the whole record." *Dun & Bradstreet, Inc.,* 472 U.S. at 761, 105 S.Ct. 2939 (plurality opinion) (quoting *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Public concern "is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego v. Roe,* 543 U.S. 77, 83–84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004). It is a question of law. *Id.*

■ Public concern is interpreted broadly. *See, e.g., TMJ Implants, Inc. v. Aetna, Inc.,* 498 F.3d 1175, 1185–86 (10th Cir.2007) (health care provider's bulletins disparaging implant manufacturer's product a matter of public concern because "thousands of people ... have a legitimate interest in the utility" of those devices); *Blue Ridge Bank v. Veribanc, Inc.,* 866 F.2d 681, 686 (4th Cir.1989) (company's inaccurate publication regarding bank's financial stability a matter of public concern because of "obvious importance of banks to the financial health of our communities").

■ Contrary to the parties' assertions, the record does not show that the trial court ruled on public concern. Nevertheless, we conclude that Doyle's statements suggesting a threat to airline passenger safety—especially because an FFDO may be "unstable" and carrying his federally-issued weapon—involve a matter of public concern. Such a threat directly impacts many people, indirectly affects air transportation overall, and may raise policy questions about the prudence of arming FFDOs.

### B. Doyle's Statements Were Actionable

Air Wisconsin next contends Doyle's statements were protected opinions rather than facts, which should not have been submitted to the jury because they depended on Doyle's viewpoint and were only expressions of concern. It also contends that they were substantially true, at least in part. We reject both contentions in turn.

### 1. Opinion

■ Pure opinions are constitutionally protected. *Gertz,* 418 U.S. at 339–40, 94

S.Ct. 2997. Statements of opinion that "reasonably impl[y] false and defamatory facts" are not. *Milkovich,* 497 U.S. at 21, 110 S.Ct. 2695. And "[s]imply couching ... statements in terms of opinion does not dispel these implications." *Id.* at 19, 110 S.Ct. 2695. Although *Milkovich* draws the constitutionally-required line between fact and opinion, states have developed their own jurisprudence in applying this distinction to particular facts.

■ Virginia courts consider two questions in determining whether a statement is fact or opinion: does it contain a provably false factual connotation, or is it "relative in nature," depending "largely on the speaker's viewpoint"? *Fuste v. Riverside Healthcare Ass'n,* 265 Va. 127, 575 S.E.2d 858, 861 (2003).

With respect to the first question, the following factors bear on whether a statement conveys a provably false factual connotation:

● Considering the statement as a whole, "opinions may be actionable where they 'imply an assertion' of objective fact." *Raytheon Technical Services Co. v. Hyland,* 273 Va. 292, 641 S.E.2d 84, 91 (2007) (quoting *Milkovich,* 497 U.S. at 18, 110 S.Ct. 2695) ("we do not isolate one portion of the statement at issue from another portion of that statement").

● The false connotation may be inferred from how listeners could have understood or would be expected to react to the statements. *WJLA–TV v. Levin,* 264 Va. 140, 564 S.E.2d 383, 393 (2002) (station "told its viewers to watch this broadcast to find out what the 'Dirty Doc' had done to his patients").

● The context of the statement informs the fact/opinion analysis. *Compare Milkovich,* 497 U.S. at 21, 110 S.Ct. 2695 (looking to "the general tenor of the article" may suggest the statement was "loose, figurative, hyperbolic language"), *with Fuste,* 575 S.E.2d at 862 (observing that "abandon" has a particular connotation in the context of a doctor's professional responsibility to patients).

■ The trial court must decide whether a statement conveys a provably false factual

connotation before it may be submitted to the jury. *WJLA–TV,* 564 S.E.2d at 392. The threshold question is whether the statement is capable of being proven true or false. *Tronfeld v. Nationwide Mutual Insurance Co.,* 272 Va. 709, 636 S.E.2d 447, 451 (2006). Because determining whether a statement conveys a false factual connotation is an issue of law, we must review this aspect of Doyle's statements to TSA de novo. *NBC Subsidiary (KCNC–TV), Inc. v. Living Will Center,* 879 P.2d 6, 11 (Colo.1994).

We conclude that the statements were properly submitted to the jury because both conveyed the factual connotation that Hoeper was a threat to aircraft or passenger safety, which was provably false, and informing TSA that Hoeper posed such a threat because of his mental instability was not relative in nature.

TSA would have understood the statements as connoting that Hoeper was a threat to aircraft or passenger safety because Air Wisconsin, through Doyle, had no other reason to communicate with TSA about him, and TSA had no other use for the information than responding to a threat, as it did. *See* § 44941 ("any suspicious transaction relevant to . . . a threat to aircraft or passenger safety"); *Fuste,* 575 S.E.2d at 863 (concluding that doctors' and hospital officials' statements to patients and other medical personnel that plaintiff doctors had "abandoned" their patients were actionable in part because prospective patients would understand them to mean that plaintiffs had breached their professional responsibility to patients). Thus, the components of the first statement—Hoeper "may be armed" and concern existed "about his mental stability"—were germane to TSA only as they bore on its threat assessment.

The second statement conveys the same factual connotation that Hoeper is a threat, and for the same reasons. It references an "unstable pilot" who is "in [the] FFDO program." Because such a pilot can carry a firearm aboard an aircraft, it injects into TSA's threat assessment that, as in the first statement, Hoeper "may be armed." And by adding "terminated today," which was un-

true, it includes an additional factor suggesting why TSA should consider him a threat.

The context in which Doyle made the statements also contributed to their being understood as provable fact. In *Fuste,* 575 S.E.2d at 861–62, the court concluded that statements conveyed provably false factual connotations because they carried particular factual weight when spoken by medical professionals about other professionals within the medical community. *Id.* As in *Fuste,* Doyle's call to TSA carried comparable factual weight because he spoke on behalf of an air carrier, about a pilot and FFDO, to the agency charged with ensuring airline security.

*WJLA–TV* is also instructive. There, the court found that by airing the story, which was based on its "under cover" investigation but minimized contradictory information, as a warning to viewers about a "Dirty Doc" who had sexually assaulted his patients, WJLA–TV had authoritatively presented the opinions of some patients as fact. *WJLA–TV,* 564 S.E.2d at 393. As in *WJLA–TV,* Doyle's statements to the TSA had weight because he was in a position to have reliable information about Hoeper's alleged mental instability and employment status.

### 2. Provably False

The factual connotation that Hoeper posed a threat was capable of being proven true or false, *see Raytheon,* 641 S.E.2d at 91 (statement was fact because its "negative import" was "susceptible to empirical proof"), by considering it in the context of airline security. *See Fuste,* 575 S.E.2d at 862 ("since the term 'abandon' has a particular connotation in the context of a doctor's professional responsibility to a patient . . . the statement that Drs. Fuste and Vanden Hoek 'abandoned' their patients is demonstrably true or false"). Hoeper's alleged termination and mental instability were likewise provable as true or false. His employment status was determinable from company records and his stability was ascertainable from the people who had been in recent contact with him at the simulator, driving to the airport, and at ALPA. *See Tronfeld,* 636 S.E.2d at 447 (explaining that whether a lawyer rendered value to

clients was determinable from settlements and judgments he had obtained).

Doyle's use of the word "concern" in characterizing Hoeper's mental stability does not require a contrary conclusion. As the court explained in *Fuste*, 575 S.E.2d at 862, "evidence could be presented to show whether there were, in fact, concerns about the plaintiffs' competence."

### 3. Relative in Nature

Air Wisconsin's attempt to avoid liability based on *Raytheon*, because the statements about Hoeper's mental instability allegedly were "relative in nature," is unpersuasive, both factually and legally.

In *Tronfeld*, 636 S.E.2d at 449, the court held statements that the plaintiff attorney "just takes people's money" and that his clients "would receive more money [for their claims] if they had not hired" him provably false rather than dependent on the defendant's viewpoint. The court distinguished *Chaves v. Johnson*, 230 Va. 112, 335 S.E.2d 97, 99 (1985), where it had first articulated the "relative in nature" test concerning a competitor's statement that the plaintiff architect was charging "more than what could be considered a reasonable fee." The *Chaves* court held the statement to be opinion because given its source, the "relative nature of such opinions is obvious to anyone who hears them," in that the import "depended largely on the speaker's viewpoint." *Id.* at 101. The court explained that "[a] corporal might seem inexperienced to a sergeant but not to a private." *Id.*

But the *Tronfeld* court declined to extend the reasoning in *Chaves*, explaining that the statements in *Tronfeld* were not "based solely on a speaker's viewpoint of what 'reasonable' would be." 636 S.E.2d at 451. The statements in *Tronfeld* were objectively measurable—whether the defendant "took people's money" without furthering their

cases—whereas the statement in *Chaves* was not objectively measurable because it depended on the "speaker's viewpoint," a competitor asserting it "can undersell others." *Id.*[9]

Doyle's statements to TSA identifying Hoeper as a threat to aircraft or passenger safety are not relative because unlike a competitor, as an industry participant Doyle would be expected to provide unbiased information to TSA. And unlike statements of a competitor, which "fall on prospective customers' ears like repetitive drumbeats," *id.*, TSA must investigate any threat reported by an air carrier. *See* ATSA §§ 44904–44905. As in *Tronfeld*, Doyle's assessment was provably false because he asserted specific, objective information about mental instability and termination rather than subjective information reflecting only his viewpoint.

In contrast, the *Raytheon* court concluded that three of five statements had been improperly submitted to the jury as actionable because they were opinions. *Raytheon*, 641 S.E.2d at 91–92. The court held that stating the plaintiff was so verbose as to stop open participation in dialogue, referring to the plaintiff's "unwillingness to accept and work with this feedback," and describing the plaintiff as "inappropriately ... critical" were matters of opinion because "the negative conduct, and whether and how often it occurred, is a matter of the speaker's perspective." *Id.* at 92. But here, on behalf of Air Wisconsin, Doyle conveyed that Hoeper was a threat because of mental instability. Thus, he removed comparable relativity by advising the agency of circumstances he knew would invoke its responsibility to investigate threats to aircraft and passenger safety.

Air Wisconsin cites generalized statements about mental instability in cases from jurisdictions other than Virginia. But they are not analogous to an airline employer reporting one of its employee's mental instability in the context of his threat to a departing pas-

---

9. In support of this argument, Air Wisconsin also cites *Gibson v. Boy Scouts of America*, 163 Fed. Appx. 206, 212–3 (4th Cir.2006) (unpublished) (finding statement that plaintiff was "unfit" to be a Scoutmaster to be opinion because of no "discernable criteria against which to measure 'fitness' "). We decline to address this unpublished

case because the Virginia courts have developed this line of authority. *See* 4th Cir. Local Rule 32.1 (citation of Unpublished Dispositions in 4th Cir. "disfavored," but opinion may have precedential value if no published opinion "would serve as well").

senger flight. Those cases, much like the statements in *Raytheon,* include only generalized characterizations of mental instability, devoid of any connotation that the speaker is urging or expecting action based on that characterization.[10]

Here, Doyle conveyed "unstable" in the literal sense because this information was inextricably intertwined with his overall connotation that Hoeper was a threat to a departing airline flight. Accordingly, we conclude that Doyle's statements to the TSA were actionable, because the factual connotation that Hoeper was a threat to aircraft and passenger safety was provably false.

#### 4. Substantially True

Alternatively, Air Wisconsin contends portions of the statements were substantially true because as an FFDO officer, Hoeper was authorized to carry a gun, the whereabouts of his weapon was unknown to Doyle, and his termination was imminent. According to Air Wisconsin, those portions of the statements render the statements as a whole substantially true, and thus, not actionable. We disagree.

■■■■■ An alleged defamatory statement "must be provable as false before there can be liability under state defamation law." *Milkovich,* 497 U.S. at 19, 110 S.Ct. 2695 (citing *Philadelphia Newspapers Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986)). The plaintiff in a defamation action must prove that the statement is false. *Williams v. Garraghty,* 249 Va. 224, 455 S.E.2d 209, 216 (1995). Once the trial court has determined that a statement can be proven true or false, proof of falsity is a question for the jury and our review is limited to whether sufficient evidence supports the jury's decision. *McIntyre v. Jones,* 194 P.3d 519, 528 (Colo.App.2008) ("[t]he answer

to the question whether a statement is true . . . will not implicate constitutional protections").

■■■ "Slight inaccuracies of expression are immaterial provided the defamatory charge is true in substance." *Saleeby v. Free Press, Inc.,* 197 Va. 761, 91 S.E.2d 405, 407 (1956). And "[a] plaintiff may not rely on minor or irrelevant inaccuracies to state a claim for libel." *Jordan v. Kollman,* 269 Va. 569, 612 S.E.2d 203, 207 (2005).

■■■ Air Wisconsin has conceded that Hoeper was not terminated until the day after Doyle made the call. Given the context—a warning to TSA about a passenger who posed a threat because he was unstable—adding to the threat assessment that Hoeper was terminated "today" is not a harmless inaccuracy. Rather, it presents an additional fact purporting to explain to TSA why Hoeper was unstable, and thus, a threat.

We will assume that stating an FFDO may be armed is always potentially true. But the factual connotation depends on looking at the statement as a whole. *Raytheon,* 641 S.E.2d at 91 ("we do not isolate one portion of the statement at issue from another portion of that statement"). As we have explained, taken as a whole, the statement connoted that this FFDO was so unstable as to threaten the safety of the aircraft he was boarding. Thus, partial truth does not defeat liability for the negative factual connotation.

Furthermore, *Raytheon* does not support Air Wisconsin's assertion that if portions of the two statements are substantially true, they should not have been submitted to the jury, and we must order a new trial. The *Raytheon* court reviewed five separate statements that were submitted to the jury, evaluating whether each statement, taken as a

---

10. *See Lifton v. Board of Educ.,* 416 F.3d 571, 578–79 (7th Cir.2005) (finding a school principal's "offhand" comments to the assistant principal and a parent about a teacher—that she was "lazy," a "burn out," "resting on her laurels," and "unstable"—to be opinion because they were "vague," "bare statements" that lacked any context, such as a purpose suggesting that the allegations were more specific, and therefore verifiable); *Haywood v. Lucent Technologies, Inc.,* 169 F.Supp.2d 890, 916 (N.D.Ill.2001) (although

court found former employer's assertion to company security that terminated employee was "unstable" "conceivably verify[able]," neither party had explained how it was verifiable); *Kryeski v. Schott Glass Technologies, Inc.,* 426 Pa.Super. 105, 626 A.2d 595, 601 (1993) (concluding that statement by fellow employee to friend of plaintiff employee that she was "crazy" was "not meant in the literal sense," did not cause the recipient to treat the plaintiff differently, and so was "no more than a vigorous epithet").

whole, was opinion or fact. After determining three statements to be opinion, the court reversed and remanded because, unlike here, the instructions did not require the jury to address each statement separately.

### C. De Novo Review of Actual Malice

Air Wisconsin finally argues that the record does not include clear and convincing evidence sufficient to warrant a finding of actual malice. Because we conclude that Doyle had obvious reasons to doubt the accuracy of his statements that Hoeper was unstable, which along with the statement that he may be armed connoted a threat to an aircraft or passengers, we disagree.

■■■ Alone, falsity does not establish actual malice. *Harte–Hanks Communications, Inc.*, 491 U.S. at 681, 109 S.Ct. 2678. Instead, actual malice requires proof that the defendant "entertained serious doubts as to truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Although "mere proof of failure to investigate, without more, cannot establish reckless disregard [of] the truth," *Gertz*, 418 U.S. at 331, 94 S.Ct. 2997, a defendant's purposeful avoidance of the truth may be sufficient to demonstrate actual malice. *Harte–Hanks Communications, Inc.*, 491 U.S. at 692, 109 S.Ct. 2678.

Because alone, "[p]rofessions of good faith will be unlikely to prove persuasive," a court must probe a defendant's good faith when presented with evidence to the contrary. *St. Amant*, 390 U.S. at 731, 88 S.Ct. 1323. Such inquiry may also be necessary where a defendant publishes statements that are "highly improbable." *Harte–Hanks Communications, Inc.*, 491 U.S. at 691, 109 S.Ct. 2678.

■■■ "[A] plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence . . . and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." *Harte–Hanks Communications, Inc.*, 491 U.S. at 668, 109 S.Ct. 2678. Actual malice may be inferred "from objective circumstantial evidence, which can override a defendant's protestations of good faith." *Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th

Cir.1992); *see also Fiber Systems Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1170 (5th Cir.2006); *Perk v. Reader's Digest Ass'n*, 931 F.2d 408, 411 (6th Cir.1991).

Such evidence may involve a "defendant's own actions or statements, the dubious nature of his sources, [or] the inherent improbability of the story or other circumstantial evidence." *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293 (D.C.Cir.1988).

■■■ Circumstantial proof of a speaker's state of mind also includes credibility evidence. *See Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 190 (2d Cir.2000) ("[t]he finding of actual malice is bolstered by Pelayo's conflicting testimony"); *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1210 (11th Cir.1999) (Tjoflat, J., concurring in part and dissenting in part) (noting actual malice could be inferred from some ALPA officials' knowledge at odds with statements of other officials).

In constitutional defamation cases involving media publishers, reckless disregard turns on what the publisher knew or had reason to know at the moment of publication. Courts look at the publisher as a whole—sources, reporters, and editors—to weigh prepublication awareness that the statements were probably false.

■■■ Here, Doyle made the call to TSA. The other three Air Wisconsin employees involved in the pre-call decision provided limited information to Doyle, primarily details of the FFDO program. They disavowed any knowledge of what he would, or specific direction about what he should, tell TSA. Hence, our reckless disregard analysis focuses on whether Doyle had obvious reasons to doubt the accuracy of his statements, and we conclude that he did.

As discussed in section IV(B) above, we have identified the provable negative connotation in both statements as Hoeper posed a threat to airline passenger safety. And whether Hoeper posed such a threat hinged on his alleged mental instability. We first consider whether Doyle had obvious reasons to doubt that Hoeper was mentally unstable.

Doyle agreed that when he called TSA, he was incapable of judging Hoeper's mental stability. He knew from reliable sources that: Hoeper had walked out of his last-chance simulator training after exchanging words with Schuerman, which made Schuerman uncomfortable; Hoeper had a similarly angry exchange in at least one previous training session; and Hoeper understood his termination was probable.

The other three Air Wisconsin employees with whom Doyle met just before he called TSA did not express their concerns about Hoeper's mental state, nor did any of them provide specific information from which Doyle could draw that conclusion. To the contrary, based on the discussion neither La-Ware nor Orozco would have told TSA that Hoeper was unstable, and Frisch did not have any reason to question Hoeper's mental instability. Thus, we conclude that Hoeper presented clear and convincing evidence Doyle entertained significant doubt as to the accuracy of his statement about Hoeper's mental instability.

We further conclude that Doyle had obvious reasons to doubt that Hoeper posed a threat to airline passenger safety. Doyle knew that while Hoeper's termination was likely, he had not yet been terminated. Doyle was informed during the meeting that Hoeper should not have had his firearm with him, per FFDO procedures, and he lacked information that Hoeper had ever violated any procedures required by his FFDO certification.

The connotation that Hoeper posed a threat to the UAL flight was also inherently improbable. Hoeper had been a commercial pilot for twenty years and an Air Wisconsin captain for almost a decade, most recently in a trainer position. The record contains no evidence that Hoeper had ever acted contrary to passenger safety.

Neither LaWare nor Orozco identified any information, other than Doyle's rendition of his telephone conversation with Schuerman, indicating that Hoeper posed a threat. Frisch recalled no reason having been presented why Hoeper would have been a threat to the UAL flight. Moreover, Hoeper's quarrel, if any, was with Air Wisconsin, not

UAL, and the other Air Wisconsin employees from the training were not booked on the same flight as Hoeper.

Three aspects of Doyle's conduct on December 8 and thereafter assist us in resolving against him any doubt as to clear and convincing evidence of actual malice.

First, Doyle's actions following Schuerman's 11 a.m. telephone call reporting the simulator incident were inconsistent with his then purported belief that Hoeper was a threat. After the phone call, Doyle: asked Scharf to drive Hoeper to the airport, but did not warn him to be cautious in dealing with Hoeper; caused Hoeper to be booked on the 1:30 UAL flight; saw Orozco at noon but agreed to postpone discussion about Hoeper until after Orozco returned at 1:30; never contacted UAL; and waited over three hours to contact TSA. Cf. *Liberty Lobby, Inc.*, 838 F.2d at 1293.

Second, the day after the TSA call, Doyle first documented another alleged training incident involving Hoeper. According to Doyle's notes, this incident had occurred on October 14, and he "fear[ed] for [his] own physical harm." At some point after December 9, Doyle added to his notes that based on Hoeper's conduct, he also feared for others' safety.

However, Doyle had not previously mentioned to anyone at Air Wisconsin that he had felt threatened by Hoeper or warned any Air Wisconsin personnel to be cautious in dealing with Hoeper. He had not taken any corrective action with Hoeper, but instead had arranged for Hoeper to have more simulator training with Air Wisconsin personnel. Doyle had not made any contemporaneous notes about this incident in Hoeper's record, although that would have been proper had he felt threatened. The credibility of Doyle's documentation that he was in fear for himself and others is further undercut by the arbitration testimony of Hoeper that he, Doyle, and the Air Wisconsin instructor met for dinner and drinks that evening, which Doyle acknowledged was correct.

Evidence of Doyle's discussion of the ramifications of his call to TSA with various federal agencies before he began these notes

strongly suggests that he attempted to bolster the grounds for the threat connotation of the TSA call by exaggerating the events of October 14.

Third, in Doyle's notes of the TSA call, also made the next day, he wrote:

> William Hoeper, a disgruntled company employee (an FFDO who may be armed) was traveling from IAD–DEN later that day, and we were concerned about the whereabouts of his firearm, and his mental stability at that time.

But in his trial testimony, Doyle denied having told TSA of concerns about Hoeper's "mental stability." This testimony was contradicted by TSA's records of the call, which refer to "unstable tendencies" and "unstable pilot." *See Celle,* 209 F.3d at 190 (finding of actual malice bolstered by reporter's conflicting testimony).

In sum, we agree with amicus United States that, "[o]nly in the highly unusual situation in which an air carrier has acted with knowing falsity or reckless disregard of the truth or falsity of its statements does the air carrier need to fear being held liable for its statements to TSA. . . ." On the particular evidence presented, this is just such an unusual case.

Accordingly, on de novo review we conclude that clear and convincing evidence shows Doyle acted with actual malice in communicating to TSA.

## V. Prejudgment Interest

On cross-appeal, Hoeper contends the trial court erred by denying his request for prejudgment interest. We disagree.

Hoeper moved for entry of judgment and requested prejudgment interest under Colorado law. Air Wisconsin opposed the motion, arguing that Virginia law applied to prejudgment interest. Citing *AE, Inc. v. Goodyear Tire & Rubber Co.,* 168 P.3d 507 (Colo.2007), which was decided before trial, the court found that Hoeper had waived prejudgment interest because he failed to tender jury instructions or verdict forms on recovering

prejudgment interest, as required by Virginia law. In *AE, Inc.,* 168 P.3d at 511, the Colorado Supreme Court discerned "no convincing reason to engage in a different choice of law analysis to determine the law applicable to a claim for prejudgment interest," and held that "the same law that governs the underlying cause of action in a tort case also governs the award of prejudgment interest."

■ Section 8.01–382 of the Virginia Code "provides for the *discretionary* award of prejudgment interest by the trier of fact, who 'may provide for' such interest and fix the time of its commencement." *Dairyland Ins. Co. v. Douthat,* 248 Va. 627, 449 S.E.2d 799, 801 (1994). Thus, in Virginia the decision whether to award prejudgment interest rests with the jury. *See Upper Occoquan Sewage Authority v. Blake Construction Co.,* 275 Va. 41, 655 S.E.2d 10, 23 (2008).

■ Here, we agree with the trial court that because Hoeper failed to request jury instructions or verdict forms on prejudgment interest, he waived this issue. *See Banks v. Mario Industries of Virginia, Inc.,* 274 Va. 438, 650 S.E.2d 687, 694 (2007) (applying waiver to a party's failure to request jury instructions and explaining "trial court was not required to instruct the jury, sua sponte, on the elements of damages Mario was entitled to recover in the absence of a request from Banks to do so")[11].

We reject Hoeper's argument, for which he cites no authority, that because his jury instructions—while silent on prejudgment interest—were consistent with Colorado law, Air Wisconsin was required to object on choice of law grounds. The pretrial ruling that Virginia law would apply to defamation dictated that Virginia law also governed prejudgment interest under *AE, Inc.* Thus, Air Wisconsin was not required to object on this basis. *Cf. Tait v. Hartford Underwriters Ins. Co.,* 49 P.3d 337, 341 (Colo.App.2001) ("An appellate court will not disturb the trial court's ruling if the *complaining party* failed either to tender a desired jury instruction or

---

11. We express no opinion whether to apply Colorado or Virginia law on waiver because we discern no difference between them. *See Farmland*

*Mut. Ins. Cos. v. Chief Industries, Inc.,* 170 P.3d 832, 839 (Colo.App.2007) (failure to request jury instruction deemed waiver).

to object to the instruction given.") (emphasis added).

We also reject Hoeper's argument that Air Wisconsin's email response to his proposed order for entry of judgment—"this looks right, but please give me until the end of the day to give you a formal response"—indicated Air Wisconsin's consent to apply Colorado law to prejudgment interest. The email used qualified and indefinite language, and made no specific reference to prejudgment interest. *Cf. Sumerel v. Goodyear Tire & Rubber Co.*, 232 P.3d 128, 130, 2009 WL 1477006 (Colo.App. No. 07CA2465, May 28, 2009) (use of qualifying language in email does not constitute an offer capable of acceptance).

Accordingly, we conclude that the trial court did not err by denying prejudgment interest.

The judgment is affirmed and the case is remanded for further proceedings on Hoeper's outrageous conduct claim.

Judge ROMÁN and Judge ROTHENBERG * concur.